66 N.J. Super. 51 (1961)
168 A.2d 429
YARDVILLE ESTATES, INC., A CORPORATION OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
CITY OF TRENTON, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 16, 1961.
Decided February 28, 1961.
*53 Before Judges GOLDMANN, FOLEY and FULOP.
*54 Mr. Samuel Leventhal argued the cause for appellant.
Mr. Harvey Stern argued the cause for respondent (Mr. Louis Josephson, attorney and on the brief).
The opinion of the court was delivered by FULOP, J.C.C. (temporarily assigned).
This is an appeal from a judgment of the Chancery Division denying the plaintiff the right to recover the cost of water mains installed by plaintiff to connect its development in the Township of Hamilton with the water distribution system of the defendant City of Trenton.
The City of Trenton has owned a public water supply system since about 1859. Goldmann, History of Trenton (Trenton Historical Society). Prior to 1941, the city extended water service to parts of the adjacent Townships of Hamilton, Ewing and Lawrence. By resolution of February 6, 1941, the Board of Commissioners of Trenton laid down a policy with respect to the further extension of water mains in these townships. Under this resolution, main feeder lines were to be laid by the city at its own expense. The city also undertook to extend water lines for new developments at the rate of 1,000 feet of main for each 14 houses. For fewer houses or greater distances, the owner was to pay in advance the cost of the mains.
This resolution was rescinded by a new resolution dated June 4, 1953, setting a new policy requiring all owners, developers and builders in the townships to install water main extensions and related connections at their own expense, or to pay for them if installed by the city. The resolution recites the extensive development of tracts of land in these municipalities and that "it has become an unbearable financial burden for the City of Trenton to continue water main extensions," etc.
Thereafter the city recognized and performed all commitments for extensions made prior to the adoption of the 1953 resolution. Applications for extensions made after June 4, *55 1953 were granted only upon the terms of the resolution of that date. The performance of prior commitments, the laying of new trunk lines and other enlargements and improvements of the system were covered by a series of ordinances and bond issues, involved large expenditures of money on the part of the city, and have taken a number of years to complete. Some were not completed at the time of the trial of this case.
In 1954 plaintiff negotiated with the superintendent of the water works for the extension of mains to a proposed development of dwelling houses in Hamilton Township. Its representatives were informed of the terms imposed by the 1953 resolution and that plaintiff would be required to install the mains at its own expense. Plaintiff agreed to and did lay the mains at a cost of $44,667. It built and sold 263 dwelling houses supplied with water by this means.
These mains were installed between November 1954, and June 1955. During the summer of 1955 plaintiff's representatives discussed with the superintendent of the water works the possibility of obtaining reimbursement from the city for all or part of the cost of installing the mains. He told them that the city planned to apply to the Board of Public Utility Commissioners for an increase in water rates and suggested that plaintiff might obtain reimbursement by application to that board. Plaintiff made no such application. The water rates were increased effective October 1, 1956.
The present action sought specific performance of an alleged agreement to reimburse plaintiff, for an accounting of water revenues from the houses constructed by plaintiff, and other ancillary relief. In short, plaintiff sought to compel defendant to repay to plaintiff out of water revenues all or a substantial part of the cost of the installation of the mains, under a formula applied to privately owned water utilities by the Board of Public Utility Commissioners. Relief was denied after a full trial in the Chancery Division. Since no question is raised with respect thereto, we *56 express no opinion as to the propriety of bringing this type of action in that court.
The trial judge held that there had been no agreement by defendant to reimburse the plaintiff for the cost of the water mains. We agree with that finding of fact. The discussions of reimbursement were held after installation of the mains had been completed or nearly so. There was no promise of reimbursement by anyone. In any event, any statement on the subject that might have been made by the superintendent of the water works would have been contrary to the policy adopted in the 1953 resolution, was unauthorized by the governing body, and could not bind the city.
However, the plaintiff further contends that:
1) The city discriminated against plaintiff and others in requiring them to pay for their water mains while itself paying for other extensions;
2) The resolution of June 4, 1953 was abandoned or vitiated by the city's subsequent conduct and disregard thereof;
3) The sale of water outside of the City of Trenton is a proprietary function and the city is governed by the law applicable to privately owned public utilities;
4) The resolution of June 4, 1953 was without statutory authority and ultra vires.
Upon these premises, plaintiff claims an equitable right to reimbursement without regard to any alleged contract between the parties.
The record reveals that after June 4, 1953 the City of Trenton installed no water main extensions in the townships at its expense except (a) pursuant to commitments made before the date of that resolution, (b) to a public school, (c) trunk lines (mains over 12 inches in diameter) for the enlargement of the supply system and (d) it reconstructed a previously existing line to a General Motors plant. On the other hand, mains were installed at the expense of developers from June 1953 to March 1, 1958, amounting to $280,494. There is no single instance shown of an extension *57 of a supply line to a development or dwelling house outside of Trenton except in accordance with this policy. Most of the work done at the public expense was projected as part of the city's application for a rate increase and as a condition thereof. Upon a review of the record, we find there was no discrimination in fact between users in like situations. Nor did the city, by anything it did after June 4, 1953, disregard, vitiate, or abandon the policy it had adopted by resolution of that date.
We find nothing to support plaintiff's argument that the city was engaged in a proprietary function and thereby subjected itself to the laws governing privately owned utilities. Plaintiff refers us to R.S. 40:62-24, which provides that:
"Every municipality in supplying electricity, gas, steam, or other product beyond its corporate limits is hereby declared to be a public utility * * *."
This section appears as part of R.S. 40:62-12 thru 25, constituting Article 5, of Title 40, Chapter 62, entitled "Power, Heat And Light Plants." It was expressly held not to include water supplied by a municipal corporation. In re Glen Rock, 25 N.J. 241 (1957).
Trenton's municipally owned and operated water utility is not subject to the jurisdiction, rules and regulations of the Board of Public Utility Commissioners, except for the fixing of rates to be charged consumers who reside outside the city limits, L. 1947, c. 295, N.J.S.A. 40:62-85.1 (applying to second class cities of not less than 120,000 population  Trenton was within this category under the 1950 census but will not be when the 1960 census is officially promulgated). The provisions of R.S. 40:62-49(f) subject to the jurisdiction of the Board of Public Utility Commissioners only such municipalities as, subsequent to the adoption of that law, acquired a water utility that had previously served outlying areas. Trenton acquired its water utility long before the passage of the latter act. Cf. In re Glen Rock, 25 N.J. 241 (1957). Accordingly, we hold that the *58 city was not subject to any law applicable to privately owned public utilities with respect to the water main extensions.
The power of a municipality operating a water supply system to require users to pay for the cost of main extensions within the municipality was questioned by dictum in Reid Development Corporation v. Parsippany-Troy Hills Tp., 10 N.J. 229 (1952) and decided adversely to the power in Reid Development Corporation v. Parsippany-Troy Hills Tp., 31 N.J. Super. 459 (App. Div. 1954). The latter case also held, however, that the municipality may refuse to extend mains when in its fairly exercised discretion it deems it uneconomic to do so. In Mongiello v. Borough of Hightstown, 17 N.J. 611 (1955), the Supreme Court held:
"Within its territorial borders the municipality must ordinarily extend its water service to all of its inhabitants on like terms; there are, however, many decisions which recognize that even when dealing with its own inhabitants a municipality has discretionary authority to decline to extend its water mains or enlarge its water system where the cost to the community would be grossly disproportionate to the individual needs presented. * * * Neither in the Reid case nor in any of the other cited cases is there any suggestion that the public utility aspect of the municipal water system may be extended to compel service outside the municipal borders; and there are decisions indicating the contrary."
The Mongiello case may be distinguished, however, because the Borough of Hightstown had not undertaken to serve East Windsor or its residents generally and never sought or acquired any monopoly there. The City of Trenton has undertaken to serve the residents of Hamilton Township generally and well may have a monopoly there. The Mongiello case did, however, inferentially approve an arrangement under which a few people in East Windsor were supplied with water through mains supplied by them at rates a fixed percentage higher than the rates to residents of Hightstown.
R.S. 40:62-83 expressly provides that a municipality "may make any contract or contracts for the sale and delivery of a supply of water to any person, either within or without the territorial limits of the municipality, for any *59 period agreed upon not exceeding twenty-five years * * *." This appears to be adequate statutory authority for contracting for the construction of mains at the expense of those seeking the water supply and it was so held in Woodside Homes, Inc. v. Town of Morristown, 26 N.J. 529 (1958). It is axiomatic that a municipal corporation is a creature of the Legislature and possesses not only such rights and powers as have been granted in express terms but also such as arise by necessary or fair implication, or are incidental to the powers expressly conferred. Any law concerning municipal corporations must be liberally construed in their favor. N.J. Const. 1947, Art. IV, § VII, par. 11; R.S. 40:42-4; Mullin v. Ringle, 27 N.J. 250 (1958); Thornton v. Village of Ridgewood, 17 N.J. 499 (1955); Dover Tp., Ocean County v. Kassenoff, 37 N.J. Super. 582 (App. Div. 1955); Marangi Bros. v. Bd. of Com'rs., Ridgewood, 33 N.J. Super. 294 (App. Div. 1954).
In Woodside Homes, Inc. v. Town of Morristown, supra, the court indicated by way of dictum that the power granted by R.S. 40:62-83 is subject to the provisions of R.S. 40:62-85, which provides in part as follows:
"Any municipality owning or controlling waterworks may supply dwellers and other consumers of water in other municipalities through which its mains may pass with water, and for that purpose may lay its mains and water pipes in or under any street, highway, alley or public place in the other municipality. The water shall be supplied to such dwellers and other consumers of water in other municipalities upon the same, or as favorable terms and conditions, as water shall be furnished to dwellers within such municipality for the supplying of which with water such waterworks have or shall have been organized or established." (Emphasis supplied)
The forerunner of this statutory provision was Chapter 206 of the Laws of 1899, entitled "An Act to authorize towns, townships and boroughs owning or controlling water-works to supply dwellers in towns, townships and boroughs, through which their mains may pass, with water." The act consisted of two sections. The first section was the predecessor of R.S. 40:62-85. An examination of the original bill in *60 the State Library reveals no statement of purpose annexed to the bill.
The section was repealed in 1917 and re-enacted as a part of "An Act concerning municipalities," L. 1917, c. 152, Article XXXII, par. 16. It now referred to "any municipality" rather than any town, township or borough. The recipients of the service referred to were described as "dwellers in other municipalities through which their mains may pass."
The statute was amended by Chapter 63 of the Laws of 1920 to provide expressly what had been held to be required in Town of Kearny v. Mayor and Council of City of Bayonne, 90 N.J. Eq. 499 (Ch. 1919), affirmed 92 N.J. Eq. 627 (E. & A. 1921).
It was carried into the 1937 revision with some slight changes in language, one of which may be mentioned here. From 1899 to 1937, the statute required that water be supplied "upon the like or as favorable terms and conditions." The 1937 revision provides "upon the same, or as favorable terms and conditions." "A revision is not construed to alter preexisting law unless there is a clear indication that the Legislature desired it to have such effect." Kessler v. Zink, 136 N.J.L. 479 (E. & A. 1948); In re Glen Rock, 25 N.J. 241 (1957).
The history of the statute thus reveals that it was not originally a part of a general scheme for the regulation of municipal water supplies but was separately enacted. In all probability it was passed to meet a particular situation in which a municipality had contracted or desired to contract with persons in other municipalities over whose lands it needed rights of way, to supply the landowners with water from those mains. See Town of Kearny v. Mayor and Council of City of Bayonne, supra. Throughout its history the statute granted the power to supply consumers in other municipalities "through which their mains may pass." The statute refers specifically therefore to a situation in which the mains pass through a municipality in which water is not then being supplied. This was noted in Mongiello v. *61 Borough of Hightstown, 17 N.J. 611 (1955), where the Supreme Court said:
"* * * it may well be that this statutory language had reference to situations in which the municipality's water supplies originated outside its borders and passed through other municipalities to reach it."
The case before us does not involve an incidental supplying of water along a municipally owned main in another municipality through which the main passes. It is not governed by R.S. 40:62-85.
Regardless of that statutory provision, it is clear that a municipality may not impose illegal conditions upon the supplying of water and may not discriminate among users in like situations. Reid Development Corporation v. Parsippany-Troy Hills Township, 10 N.J. 229 (1952). But that does not necessarily require that all of the terms and conditions must be the same for all users. It is established that those within the municipality have first right to the water supply. Mongiello v. Borough of Hightstown, supra. They furnish the capital and are called upon to pay any deficits in operating costs of the system. Developers may be accorded different treatment from individual residents. Woodside Homes, Inc. v. Town of Morristown, supra. Reasonable differentiation of treatment among users in different situations is not discrimination.
In the present case the evidence shows that by 1953 the City of Trenton had been largely built up with very little room for housing developments, while the outlying townships were developing at a rapid rate. The installation of mains to all parts of the city had been largely completed, while large and distant areas of the townships had not yet been serviced. The city had the discretionary power to enter into contracts for service of water outside of its limits or to refuse to extend service. Where the city may refuse service entirely, it may grant service on condition that the users provide their own conduits.
*62 However, even if it were assumed that the condition imposed by defendant upon the extension of water service was discriminatory or illegal, plaintiff voluntarily installed the mains at its own expense, without protest. It is elementary law that a voluntary payment, i.e. one made without fraud or duress on the part of the payee and without mutual mistake, is not recoverable. City of Camden v. Green, 54 N.J.L. 591, 33 Am. St. Rep. 686 (E. & A. 1892); Sutton v. Metropolitan Cas. Ins. Co. of New York, 117 N.J.L. 21 (Sup. Ct. 1936); S.P. Dunham & Co. v. Kudra, 44 N.J. Super. 565 (App. Div. 1957).
Plaintiff contends that it was essential for it to build and sell promptly in order to run a profitable development, so that it was compelled to refrain from testing the right of the city to require it to pay for the mains and it was compelled to pay for the same rather than to litigate the question first. It is obvious that the availability of a supply of water is one of the primary requirements for a modern housing development. In planning its development, plaintiff must, of necessity, have ascertained at an early stage the terms and conditions on which it could obtain water. If it did not, any loss of profits was due to its own neglect. In any event, plaintiff had the choice of delaying long enough to litigate the validity of the city's position, paying under protest reserving its rights, not building at all, or accepting the city's terms. It chose to accept the city's terms without protest. Plaintiff's purpose was to build for profit. It must have determined that it would be profitable to do so in spite of the cost here involved.
It has specifically been decided that the imposition of a condition of the character here imposed does not constitute economic duress. In Woodside Homes, Inc. v. Town of Morristown, supra, the Supreme Court held:
"It is our view that the appellant is estopped from presently asserting that Morristown abused its discretion * * *. The appellant entered into a contractual arrangement with Morristown and it cannot deny the efficacy of its undertaking. * * *
*63 Appellant asserts that the contract is not a bar to recovery because it was not voluntarily entered into; that its assent was coerced by economic compulsion or duress. * * * Before the doctrine of business compulsion can be invoked there must be an assent by one party to an improper or wrongful demand by another under circumstances in which the former has little choice but to accede to the demand * * *. It is essential before duress is found that the complainant be compelled to accede by wrongful pressures. * * *
We have previously alluded to the fact that the demand on the part of Morristown cannot, in the absence of an order compelling it to extend its water mains at its own cost, be considered wrongful. * * * No formal protest was ever registered * * *."
Plaintiff was dealing with a public body. If defendant improperly refused to extend the water main, plaintiff had the right to proceed by action in lieu of mandamus to compel it to do so. In Lake Intervale Homes, Inc. v. Parsippany-Troy Hills, 28 N.J. 423 (1958), the Supreme Court said: "* * * the developer will not ordinarily be permitted, after demand and refusal, to install the improvement and then bring an action for damages." Such a course amounts in effect to a fraud upon the defendant. Defendant had determined that the taxpayers of the city could not afford further extensions. By acquiescing in the condition imposed, plaintiff succeeded in getting its water supply. Having achieved its end, it would now repudiate the condition, forcing the city to contribute to its development. It is estopped from doing so. Woodside Homes, Inc. v. Town of Morristown, supra.
There has not come to our attention any case in which recovery has been allowed under like circumstances. Two recent cases in which recovery was allowed are wholly distinguishable.
In Lake Intervale Homes, Inc. v. Parsippany-Troy Hills, supra, the municipality expressly agreed to repay up to $6,000 of the cost of installing the water main extensions if the legal questions raised were decided against it. Thus the court, in allowing recovery, enforced the contract made by the municipality. The developer had not only protested but had *64 declined to install the mains except upon an agreement reserving the legal questions.
So also in Ecloss Co. v. Parsippany-Troy Hills Township, 55 N.J. Super. 552 (App. Div. 1959), the municipality expressly agreed to reimburse the developer for the cost of the mains. The agreement was unenforceable for uncertainty. The court allowed recovery on quantum meruit in lieu of the contract, erecting an implied or quasi-contract upon the manifested intention of the parties.
In the case before us there was no agreement to reimburse. There was an express agreement by the plaintiff without protest to pay for the mains in return for obtaining the water supply, which agreement was fully performed on both sides. The equities are in favor of the defendant.
The judgment of the Chancery Division is affirmed, with costs.